ROSEMARY TAFT MILBY
GEORGE R. HICKS, JR.
MICHAEL F. SCHMITZ
WELTMAN WEINBERG & REIS CO LPA
323 W Lakeside Avenue, Suite 200
Cleveland , OH 44113
Fax: 216-685-4345
Telephone:  216-685-1169
Email: rtaftmilby@weltman.com
Telephone:  216-685-1108
Email: ghicks@weltman.com
Telephone:  216-685-1106
Email: mschmitz@weltman.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA (PHOENIX DIVISION)

---

COMMONWEALTH CAPITAL
CORPORATION,

        Plaintiff,

        v.

CITY OF TEMPE; MOBILEPRO
CORPORATION; and NEOREACH,
INC.,

        Defendants.

Case No. 2:09-cv-00274-JWS

JUDGE JOHN W SEDWICK

---

CITY OF TEMPE,

        Counter-Claimant,

        v.

COMMONWEALTH CAPITAL CORP.,

        Counter-Defendant.

**PLAINTIFF/COUNTER-DEFENDANT COMMONWEALTH CAPITAL
CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Now comes the Plaintiff/Counter-Defendant Commonwealth Capital Corporation (hereinafter "CCC"), by and through counsel, and hereby submits its Memorandum of Law in support of its Motion for Partial Summary Judgment.

# I. <u>INTRODUCTION</u>

This case has been narrowed to one overriding issue, namely whether CCC or Defendant/Counter-Claimant City of Tempe (hereinafter "Tempe") owns certain WiFi Equipment[1] which is the subject matter of this case.

It is CCC's position there are no issues of material fact, that it owns the WiFi Equipment, and therefore it is entitled to partial summary judgment on Count Three of its Complaint, and an Order of Possession allowing CCC to replevin the WiFi Equipment. For the same reasons, CCC is entitled to partial summary judgment on Count III of Tempe's Counterclaim, in which Tempe seeks declaratory judgment as to the ownership of the WiFi Equipment.

As set forth below and in CCC's Statement of Material Facts, and as demonstrated by the Fed. R. Civ. 56-compliant evidence in this case, there is no genuine issue of

---

[1] When used throughout this Memorandum of Law, and corresponding Motion for Partial Summary Judgment, "WiFi Equipment" refers to the specifically identified WiFi Equipment listed in the Equipment Schedules Nos. 1, 2, 3 and 6. Authentic duplicates of the Equipment Schedules Nos. 1, 2, 3 and 6 are attached to the Affidavit of Henry Abbott as Exhibit 1-I.

material fact that:  (1) the WiFi Agreement upon which Tempe bases its ownership claim does not have an after-acquired property clause; (2) that Tempe's contingent ownership interest in the WiFi Agreement, if any, vested after CCC purchased the WiFi Equipment; (3) that Tempe's unrecorded landlord's lien in the WiFi Equipment is inferior to CCC's ownership interest as a bona fide purchaser of the WiFi Equipment; and (4) that Tempe, which by its conducted and expressed representations acknowledged CCC's ownership of the WiFi Equipment, is estopped from now denying that CCC owns the Equipment.

Based on these uncontroverted facts, CCC is entitled to partial summary judgment as a matter of law, and an Order of Possession permitting the immediate replevin of the Wi-Fi Equipment.

## II.   STATEMENT OF FACTS

From 2005 to 2006, MobilePro Corp. (hereinafter "MobilePro") and and its wholly owned subsidiary NeoReach, Inc. (hereinafter "NeoReach") purchased certain WiFi Equipment from Connectronics and Pronto Networks, Inc. (hereinafter "Pronto").[2] Authentic duplicates of the Invoices for the purchase of the subject WiFi Equipment by MobilePro and NeoReach from Connectronics and Pronto are attached to the Affidavit of Henry Abbott as Exhibit 1-A.[3]

The vast majority of WiFi Equipment was ordered by MobilePro and NeoReach, and invoiced by Connectronics and Pronto, after August 18, 2005.[4]  Most, if not all of the

---

[2]  Statement of Material Facts, at paragraph 1.
[3]  Statement of Material Facts, at paragraph 2.
[4]  Statement of Material Facts, at paragraph 3.

WiFi Equipment was delivered by Connectronics and Pronto, and paid for by MobilePro and NeoReach, after August 18, 2005.[5]

On June 28, 2006, JTA Leasing Co., LLC (hereinafter "JTA") and NeoReach entered into a Bill of Sale, under which JTA purchased the subject WiFi Equipment from NeoReach for $500,000.00, as part of a sale lease back transaction.[6]   An authentic duplicate of the Bill of Sale is attached to the Affidavit of Henry Abbott as Exhibit 1-B.[7]

As part of the Bill of Sale, NeoReach warranted to JTA that it was the lawful owner of the Wi-Fi Equipment, that it had a good and lawful right to sell the WiFi Equipment, and that it had title to the WiFi Equipment free from any charge or encumbrance whatsoever.[8]

On or about June 28, 2006 JTA entered into a Master Lease Agreement (hereinafter "Lease Agreement") with MobilePro Corp and NeoReach.[9]   An authentic duplicate of the Lease Agreement is attached to the Affidavit of Henry Abbott as Exhibit 1-C.[10]

Under the Lease Agreement, MobilePro and NeoReach agreed to lease certain Wi-Fi Equipment from JTA.  See Exhibit 1-C, at paragraph 1.[11]  Further, under the Lease Agreement, it was the understanding of MobilePro, NeoReach and JTA that the WiFi Equipment would remain separate identifiable personal property of JTA, and that it

---

[5]   Statement of Material Facts, at paragraph 4.
[6]   Statement of Material Facts, at paragraph 5.
[7]   Statement of Material Facts, at paragraph 6.
[8]   Statement of Material Facts, at paragraph 7.
[9]   Statement of Material Facts, at paragraph 8.
[10]   Statement of Material Facts, at paragraph 9.
[11]   Statement of Material Facts, at paragraph 10.

would not be used, stored, or maintained in such a manner or under such circumstances that any other entity might acquire any rights or ownership in such equipment. See Exhibit 1-C, at paragraph 7(a).[12]

Under the Lease Agreement, MobilePro and NeoReach agreed to keep the Wi-Fi Equipment free and clear of all superior liens and encumbrances. See Exhibit 1-C, at paragraph 7(b). [13] Further, under the Lease Agreement, MobilePro and NeoReach agreed and warranted to promptly execute and deliver to JTA standard form UCC-1 financing statements. See Exhibit 1-C, at paragraph 10(a).[14] Under the Lease Agreement, MobilePro, NeoReach and JTA agreed that, upon default by MobilePro and/or NeoReach, JTA could take possession of any and all WiFi Equipment wherever situated, enter upon any premises without liability for so doing, and sell, dispose of, hold, use or lease said Equipment at its sole discretion. See Exhibit 1-C, at paragraph 15(a). [15]

On or about July 5, 2006 JTA entered into an Agreement of Sale and Assignment (hereinafter "Assignment Agreement") with CCC. [16] An authentic duplicate of the Assignment Agreement is attached to the Affidavit of Henry Abbott as Exhibit 1-D. [17]

Under the Assignment Agreement, JTA sold the subject Wi-Fi Equipment to CCC, and otherwise assigned to CCC its rights under the Lease Agreement. See Exhibit 1-D, at

---

[12] Statement of Material Facts, at paragraph 11.
[13] Statement of Material Facts, at paragraph 12.
[14] Statement of Material Facts, at paragraph 13.
[15] Statement of Material Facts, at paragraph 14.
[16] Statement of Material Facts, at paragraph 15.
[17] Statement of Material Facts, at paragraph 16.

paragraphs 1, 5 and 6.[18]   Under the Assignment Agreement, it was the understanding of JTA and CCC that title of the Wi-Fi Equipment would be free and clear of all liens, leases, claims and encumbrances of any kind, except for the rights of MobilePro and NeoReach under the Lease Agreement.  See Exhibit 1-D, at paragraph 4. [19]   Further, under the Assignment Agreement, JTA represented and warranted that it owned the Wi-Fi Equipment, and had good and marketable title to said Equipment free and clear of any and all leases, liens, claims and encumbrances.  See Exhibit 1-D, at paragraph 7.1.1. [20]

On September 7, 2006, CCC filed UCC Financing Statements covering the Wi-Fi Equipment. [21]   Authentic duplicates of the Financing Statements are attached to the Affidavit of Henry Abbott as Exhibit 1-E. [22]   The UCC Financing Statements evidence CCC's first and best ownership interest in the Wi-Fi Equipment, which was leased back to MobilePro and NeoReach.  See Exhibit 1-E. [23]

On September 25, 2007 MobilePro was notified by letter of default on the Lease Agreement. [24]   An authentic duplicate of the Seprtember 25, 2007 default letter is attached to the Affidavit of Henry Abbott as Exhibit 1-F.[25]   An unpaid balance of $904,620.00 remains due and owing to CCC by MobilePro and NeoReach under the

---

[18]  Statement of Material Facts, at paragraph 17.
[19]  Statement of Material Facts, at paragraph 18.
[20]  Statement of Material Facts, at paragraph 19.
[21]  Statement of Material Facts, at paragraph 20.
[22]  Statement of Material Facts, at paragraph 21.
[23]  Statement of Material Facts, at paragraph 22.
[24]  Statement of Material Facts, at paragraph 23
[25]  Statement of Material Facts, at paragraph 24

Lease Agreement. [26]   An authentic duplicate of the Statement of Account is attached hereto as Exhibit 1-H.[27]

On October 28, 2008, Andrew Ching, as City Attorney of Tempe, sent a correspondence (hereinafter "Correspondence") to Richard Devlin, as Vice President and General Counsel of CCC. [28]   An authentic duplicate of the above-referenced correspondence is attached is attached to the Affidavit of Henry Abbott as Exhibit 1-G. [29]

In the Correspondence, Tempe acknowledges that the Wi-Fi Equipment was owned by CCC, and demanded that CCC "either needs to remove its equipment immediately or pay rental fees and electricity charges for them."   See Exhibit 1-G.[30] Within the timeframe demanded by Tempe, CCC responded by contacting Tempe to arrange for the removal of the Wi-Fi Equipment, but Tempe refused to permit CCC to remove said Equipment. [31]

CCC held MobilePro assets in two private funds (Commonwealth Income & Growth Private Fund I, LLC and Commonwealth Income & Growth Private Fund II, LLC) and one publicly registered fund (Commonwealth Income & Growth Fund V, LP).[32] For all three of the funds, CCC used the performance and portfolios of these funds as a basis for new investors to evaluate CCC's track record of asset management when

---

[26]   Statement of Material Facts, at paragraph 25
[27]   Statement of Material Facts, at paragraph 26.
[28]   Statement of Material Facts, at paragraph 27.
[29]   Statement of Material Facts, at paragraph 28.
[30]   Statement of Material Facts, at paragraph 29.
[31]   Statement of Material Facts, at paragraph 30.
[32]   Statement of Material Facts, at paragraph 31.

purchasing new fund shares.[33]   CCC used the City's acknowledgement of CCC's ownership of the WiFi Equipment in its evaluation and reporting of all three of the above-mentioned funds. [34]   CCC made certain decisions, including representations to investors, and otherwise changed its position as it relates to all three of the above-mentioned funds based on the City's acknowledgement of CCC's ownership of the WiFi Equipment. [35]

## III.   LAW AND ARGUMENT

**A.   Fed. R. Civ. P. 56 standard.**

The standard of review under Fed. R. Civ. P. 56 is well established.  As stated in *Porter v. Osborn*[36]:

> Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when there is no genuine dispute about material facts and when the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show that material facts are not genuinely disputed. To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim, but need not produce evidence negating that claim.   Once the moving party meets its burden, the nonmoving party must demonstrate that a genuine issue exists by presenting evidence indicating that certain facts are so disputed that a fact-finder must resolve the dispute at trial.  * * *  [Footnote citations omitted.]

Fed. R. Civ. P. 56(d)(1) provides a procedural vehicle for establishing facts.  Such partial determinations are particularly helpful in cases such as this, where the

---

[33]  Statement of Material Facts, at paragraph 32.
[34]  Statement of Material Facts, at paragraph 33.
[35]  Statement of Material Facts, at paragraph 34.
[36]  2009 U.S. Dist. LEXIS 117822, at * 9 (D. Alaska Dec. 17, 2009) [U.S. District Judge John W. Sedwick].

determination of one issue, whether CCC or Tempe owns the WiFi Equipment, will effective resolve the case.  Fed. R. Civ. P. 56(d)(1) provides:

> (1) Establishing Facts. If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts--including items of damages or other relief--are not genuinely at issue. The facts so specified must be treated as established in the action.

It is CCC's request that the Court issue partial summary judgment, setting forth the facts that are not in dispute, and determining the key remaining issue, namely whether CCC or Tempe owns the WiFi Equipment.

**B.    Choice of Law**

As an initial determination, CCC submits that Arizona law should be applied to legal issues in this case, and specifically to the competing ownership claims of CCC and Tempe for the WiFi Equipment.

The WiFi Agreement envisions application of Arizona Law.[37]  Tempe's contingent or speculative ownership claim, if any, would arise from the WiFi Agreement.  However, CCC is a bona fide purchaser of the WiFi Equipment, and is not bound by the WiFi Agreement or its choice of law provision.

Rather, CCC's ownership interest arises from two contracts:  (1) the Bill of Sale and Lease Agreement, the latter of which contains a contractual choice of law provision providing for the application of the laws of the State of New Jersey[38]; and (2) the

---

[37]  See WiFi Agreement, at paragraph 2.11.
[38]  See Lease Agreement, Exhibit 1-C, at paragraph 18(a).

Assignment Agreement, which contains a contractual choice of law provision providing for the application of the laws of the Commonwealth of Pennsylvania.[39]  Tempe is not a party to the Lease Agreement or Assignment Agreement, and therefore is not bound by these Agreements or their choice of law provisions.

Arizona courts have adopted the Restatement to determine the applicable law in contract actions.[40]  It has been held that choice-of-law issues are questions of law, which Arizona courts will decide de novo.[41]  "When more than one state has a relationship to or an interest in a contract, courts apply a conflicts analysis to determine which state's law should govern."[42]

In this case, based on the conflicting choice of law provisions, none of which are binding on both parties, the choice of law is determined by Restatement § 188, which governs in absence of effective choice by the parties.

In this case, the location of the subject matter of all three contracts regarding the WiFi Equipment is Arizona.  As the ownership of the WiFi Equipment is the underlying issue of this case, Arizona law should be applied to the issues of this case.

**C.    CCC ownership interest in the WiFi Equipment is superior to any contingent interest claimed by Tempe.**

**1.    The WiFi Agreement does not have an after-acquired property clause.**

---

[39]  See Assignment Agreement, Exhibit 1-D, at paragraph 10.3.

[40]  See, e.g., *Swanson v. Image Bank, Inc.*, 206 Ariz. 264, at paragraph 6, 77 P.3d 439 (Ariz. 2003), citing, *Cardon v. Cotton Lane Holdings, Inc.*, 173 Ariz. 203, 207, 841 P.2d 198, 202 (1992).

[41]  *Swanson v. Image Bank, Inc.*, supra, 206 Ariz. 264, at paragraph 6, citing *Garcia v. General Motors Corp.*, 195 Ariz. 510, 516, P19, 990 P.2d 1069, 1075 (App. 1999).

[42]  *Swanson v. Image Bank, Inc.*, supra, 206 Ariz. 264, at paragraph 6, citing *Cardon*, 173 Ariz. at 207, 641 P.2d at 202 (citing Restatement § 187).

Conspicuous in its absence from the WiFi Agreement is an after-acquired property clause. The WiFi Agreement, by its terms, covered only Equipment which were components of the WiFi network on August 18, 2005.

The WiFi Agreement defines Equipment as follows: "'<u>Equipment</u>' means any tangible component of the WiFi network." The WiFi Agreement defines WiFi Network System as follows: "'<u>WiFi Network System</u>' means a broadband grid to provide WiFi Services."

The WiFi Agreement does not identify specific equipment, nor does it contain an after-acquired property clause. Instead, the WiFi Agreement only includes in its definition of Equipment tangible components incorporated into the WiFi network.

Tempe bases its claim of contingent, non-vested ownership of the WiFi Equipment on paragraph 6.5 of the WiFi Agreement, which states:

> 6.5   <u>Abandonment</u>. If NeoReach abandons the WiFi network described in this Agreement for a period of three (3) months or more, the Equipment and associated software required to operate the Wi-Fi network with the City's right-of-way shall convert to City ownership.

Notably, most if not all of the WiFi Equipment which was the subject matter of this case was incorporated into the WiFi network *after* August 18, 2005, and as such is not identified in the WiFi Agreement as "Equipment," and as such does not revert to Tempe upon abandonment of the WiFi Equipment by NeoReach and MobilePro.

Although the Uniform Commercial Code (hereinafter "UCC") does not govern the WiFi Agreement, UCC § 9-204, as codified in A.R.S. § 47-9204, and corresponding case law is persuasive as to after-acquired property.

A.R.S. § 47-9204(A) governs security interests in after-acquired property, and provides: "Except as otherwise provided in subsection B, a security agreement may create or provide for a security interest in after-acquired collateral." Arizona courts have held, under A.R.S. § 47-9204(A), that to extend to property acquired by the debtor after the creation of the security agreement, the agreement itself must expressly provide that it covers after-acquired collateral. See, e.g., *Wollenberg v. Phoenix Leasing*,[43] wherein the court recognized:

> The UCC permits a security interest to extend to property acquired by the debtor after the creation of the security agreement only if the agreement itself provides that covered obligations are to be secured by after-acquired collateral. UCC § 9-204(A). See generally 2 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE, § 24-6 (3d ed. 1988) [hereinafter White & Summers]. Because the Wollenberg-Mays chattel security agreement did not cover after-acquired collateral, the security agreement granted by Mays to Wollenberg did not cover any new customer security accounts that arose after execution of the agreement.

The same basic concept has been applied to mortgages, based on axiomatic principles of contract law. As the Supreme Court of Arizona recognized in *Kastner v. Fashion Livery Co.*[44]:

> The mortgage must show in terms that it was intended to cover future property. Jones on Chattel Mortgages, sec. 173-A; *Phillips v. Both*, 58 Iowa, 499, 12 N.W. 481. When the mortgage is intended to cover after-acquired property, either express terms should be used to that end, or it must clearly appear from the language of the instrument, and from the circumstances of the particular case, that such was the manifest intention of the parties. *Maxwell v. Wilmington Dental Mfg. Co.*, 77 Fed. 938. General terms are not sufficient to cover after-acquired property. 20 Am. & Eng.

---

[43] 182 Ariz. 4, 8-9 893 P.2d 4, 8-9 (Ariz. Ct. App. 1994).
[44] 10 Ariz. 23, 25, 85 P. 120 (Ariz. 1906).

Ency. of Law, 2d ed., p. 918, note 3.  The practical construction of the mortgage by the parties themselves, denoted by their supplemental contract of substitution and disposition of other property originally included in the same contract, is indicative that the parties themselves did not consider the mortgage as covering after-acquired property, and this practical construction is binding upon them and upon the court. *Smith v. Miami County*, 6 Ind. App. 153, 33 N.E. 243.

Likewise, in *Schatt-Ajax Indus. v. Churchill*,[45] the court noted:

Next, where the owner of personal property, in mortgaging the same, does not include a clause expressly covering personalty after-acquired by him, and thereafter he conditionally purchases other personalty, can the mortgagee claim a superior right to the after-acquired personalty and defeat the conditional seller's reservation of title to said property?  The answer is no.  15 Am.Jur.2d, Chattel Mortgages, § 101, p. 278 and § 163, p. 332. *Kastner v. Fashion Livery Co.*, 10 Ariz. 23, 85 P. 120 (1906); *Babbitt and Cowden Livestock Co. v. Hooker*, 28 Ariz. 263, 236 P. 722 (1925).  A chattel mortgage cannot attach itself to property subsequently purchased by the mortgagor on a conditional sales contract.  *Simons v. Lee James Finance Company*, 56 Wash.2d 234, 351 P.2d 507, 86 A.L.R.2d 1147 (1960).

Although neither a security agreement nor a mortgage, the same logic should apply to the WiFi Agreement.   If the parties to that contract, Tempe, NeoReach and MobilePro, wanted Tempe's contingent ownership claim to extend to property acquired by NeoReach and MobilePro after the creation of the security agreement, they should have included an after-acquired property clause, or at the very least defined "Equipment" to include components acquired by NeoReach and MobilePro after the execution of the WiFi Agreement.  However, they failed to do so.

Indeed, the above tenets of law as to mortgages are based on general contractual principles that apply to this case, namely the contractual interpretation should be limited

---

[45] 3 Ariz. App. 34, 37, 411 P.2d 457, 460 (1966)

to the expressed intent of the parties.  Regardless of the form of the contract, whether mortgage, security agreement or otherwise, the parties must show in express terms that they intended to cover future property.[46]  If the parties intended to cover after-acquired property, they should have included express terms to that end.[47]

Under Arizona law, interpretation of a contract is a matter of law to be determined by the court.[48]  Where the language of a contract is clear and unambiguous, it must be given effect as written. Id.  "The controlling rule of contract interpretation requires that the ordinary meaning of language be given to words when circumstances do not show a different meaning is applicable."[49]  As the Supreme Court of Arizona stated in *Goodman v. Newzona Inv. Co.*[50]:

> The intent of the parties, as ascertained by the language used, must control the interpretation of a contract.  *It is not within the province or power of the court to alter, revise, modify, extend, rewrite or remake an agreement.* Its duty is confined to the construction or interpretation of the one which the parties have made for themselves. *Graham County Electric Co-op., Inc. v. Town of Safford,* 95 Ariz. 174, 383 P.2d 169.  Where the intent of the parties is expressed in clear and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto. *Neale v. Hinchcliffe,* 21 Ariz. 452, 189 P. 1116.

(*Emphasis* added.)

---

[46] *Kastner v. Fashion Livery Co.*, supra 10 Ariz. At 25, 85 P. at 120.

[47] Id.

[48] *Biltmore Bank v. First Nat'l Mortg. Sources, L.L.C.*, 2008 U.S. Dist. LEXIS 14540, at * 19 (D. Ariz. Feb. 26, 2008), citing *Hadley v. Southwest Prop., Inc.,* 116 Ariz. 503, 570 P.2d 190, 193 (Ariz. 1977).

[49] Id., quoting *Chandler Medical Bldg Partners v. Chandler Dental Group*, 175 Ariz. 273, 277, 855 P.2d 787, 791 (Ariz. Ct. App. 1993) (citations omitted).

[50] 101 Ariz. 470, 472, 421 P.2d 318, 321 (Ariz. 1966).  Accord *Century Medical Plaza v. Goldstein*, 122 Ariz. 583, 585, 596 P.2d 721, 723 (Ariz. Ct. App. 1979) ("It is not our province to rewrite the agreement."), citing *Shattuck v. Precision-Toyota, Inc.,* 115 Ariz. 586, 566 P.2d 1332 (1977).

In this case, the parties to the WiFi Agreement could have contracted for an explicit after-acquired property clause, if they intended the abandonment clause to apply to after-acquired WiFi Equipment. In the alternative, they could have defined "Equipment" to clearly and unambiguously include components acquired by NeoReach and MobilePro after the execution of the WiFi Agreement. However, they failed to do so.

As such, even if the abandonment clause at paragraph 6.5 of the WiFi Agreement gives Tempe a contingent ownership interest in Equipment, by the very terms of the WiFi Agreement that ownership interest would only cover that "Equipment" owned by NeoReach and MobilePro and incorporated into the WiFi network on or before August 18, 2005. However, because most if not all of the WiFi Equipment was acquired by NeoReach and MobilePro and incorporated into the WiFi network after August 18, 2005, and because the WiFi Agreement lacks an after-acquired property clause, as a matter of law the after-acquired WiFi Equipment does not revert to Tempe upon abandonment by NeoReach or MobilePro.

**2.    The WiFi Agreement, at best, provides Tempe with a contingent, interest in the WiFi Equipment, which was vested only after CCC purchased the WiFi Equipment.**

It is anticipated that Tempe will argue that its ownership interest, if any, was first in time to CCC, because Tempe's alleged interest arises from the WiFi Agreement of August 18, 2005, and CCC's ownership interest arises from the Bill of Sale Lease Agreement of June 28, 2006, and the Assignment Agreement of July 5, 2006. Such argument, if made, would be misguided, and would ignore the fact that the WiFi

Agreement, at most, created a contingent interest in the WiFi Equipment, which vested if

at all in March 28, 2008, three months after NeoReach abandoned the WiFi network.

Arizona has long recognized the distinction between vested and contingent

interests.  As noted by the Supreme Court of Arizona in *Thurston v. Judges' Retirement*

*Plan*[51]:

> Rights are vested, in contradistinction of being expectant or contingent.
> They are vested, when the right to enjoyment, present or prospective, has
> become the property of some particular person or persons as a present
> interest. . . . They are contingent when they are only to come into existence
> on an event or condition which may not happen or be performed until such
> other event may prevent their vesting.

Likewise, in *Robinson v. Police Pension Bd.*[52], the Supreme Court of Arizona

stated:

> When the terms "vested right" and "contingent interest" and "expectancy"
> are considered and their meaning ascertained it seems wholly incongruous
> to think of the right to a pension as being "vested" when in truth and in fact
> it is a right which can only have an existence if the uncertainties of the
> future bring it into being. The distinction appears in uncounted number of
> decisions, a reasonably fair example of them being *Wirtz v. Nestos*, 51 N.D.
> 603, 200 N.W. 524, 530:
>
> "* * * the right is expectant, not vested, when it depends on the continued
> existence of the present condition of things until the happening of some
> future event; the right is contingent, not vested, when it comes into
> existence only on an event or condition which may not happen.    * * *'"

In this case, CCC's rights in the WiFi Equipment vested in July 5, 2006, upon

execution of the Assignment Agreement.  On July 5, 2006, Tempe's rights, if any, were

---

[51]  179 Ariz. 49, 50, 876 P.2d 545 (Ariz. 1994), quoting *Hall v. A.N.R. Freight System,
Inc.*, 149 Ariz. 130, 140, 717 P.2d 434, 444 (1986)
[52]  85 Ariz. 384, 339 P.2d 739, 1959 Ariz. LEXIS 224 (Ariz. 1959).

merely expectant or contingent, and came into existence if at all three months after NeoReach's abandonment of the WiFi network.

As such, notwithstanding any argument by Tempe to the contrary, there are no issues of material fact that CCC has the superior, first in time, vested ownership interest in the WiFi Equipment. As such, CCC is entitled to summary judgment as a matter of law, based on the uncontroverted facts, and immediate possession of the subject WiFi Equipment.

3. **CCC was a bona fide purchaser of the WiFi Equipment, and Tempe failed to record or otherwise provide public notice of its contingent interest or landlord's lien in the WiFi Equipment.**

There should be no factual dispute that CCC is a bona fide purchaser of the WiFi Equipment. Likewise, notwithstanding Tempe's attempts to categorize its claims otherwise, it is in effect asserting a contractual landlord's lien in the same WiFi Equipment.

Tempe appears to be asserting an unrecorded, contractual landlord's lien in the WiFi Equipment. It appears to be Tempe's argument that the WiFi Equipment was incorporated into city property (utility poles) without payment of the rental fees, as allegedly required by the WiFi Agreement.

As a general rule, the property of a tenant is subject to his landlord's lien.[53] However, it is well established that the recorded interest of a bona fide purchaser, without notice, has priority over an unrecorded interest.[54]

---

[53] 49 *Bates & Springer, Inc. v. Friermood*, 16 Ariz. App. 309, 313, 492 P.2d 1247, 1251 (1972), citing Am.Jur.2d Landlord & Tenant § 711.

A landlord's lien on personal property is not good as against a bona fide purchaser, without notice, either actual or constructive, of the lien.[55]   Further, if the goods of the tenant have been sold by him in the ordinary course of trade, these goods are not subject to the landlord's lien.[56]

In this case, CCC did not have notice of Tempe's unrecorded landlord's lien on the WiFi Equipment.  Therefore, CCC's ownership rights as a bona fide purchaser of the WiFi Equipment is superior to Tempe's unrecorded landlord's lien.  Likewise, the WiFi Equipment was sold by NeoReach and MobilePro to JTA, and from JTA to CCC, in the ordinary course of trade.  Therefore, the WiFi Equipment is not subject to Tempe's landlord's lien.

Based on the foregoing uncontroverted facts, CCC is entitled to summary judgment as a matter of law, and immediate possession of the subject WiFi Equipment.

**4.    Tempe, which by its conduct and expressed representations acknowledged CCC's ownership of the WiFi Equipment, waived or is otherwise estopped from now denying that CCC owns the Equipment.**

Based on Tempe's conduct subsequent to the abandonment of the WiFi Equipment, it is estopped from arguing that it is the owner of the WiFi Equipment or otherwise deny CCC's superior, first in time, vested ownership interest in the WiFi Equipment.

---

[54]   See, e.g., *Hunnicutt Constr. v. Stewart Title & Trust*, 187 Ariz. 301, 928 P.2d 725, 1996 Ariz. App. LEXIS 250, 230 Ariz. Adv. Rep. 43, 116 No. 50 Ariz. Bus. Gaz. 27 (Ariz. Ct. App. 1996).
[55]   *Bates & Springer, Inc. v. Friermood*, supra, 16 Ariz. App. at 313, 492 P.2d at 1251.
[56]   Id., citing Annot., 9 A.L.R. 300, 331 (1920), supplemented in Annot., 96 A.L.R. 249, 268 (1935).

Among other things, on October 28, 2008, Andrew Ching, as City Attorney of Tempe, sent a correspondence (hereinafter "Correspondence") to Richard Devlin, as Vice President and General Counsel of CCC. [57]   An authentic duplicate of the above-referenced correspondence is attached is attached to the Affidavit of Henry Abbott as Exhibit 1-G. [58]   In the Correspondence, Tempe acknowledges that the Wi-Fi Equipment was owned by CCC, and demanded that CCC "either needs to remove its equipment immediately or pay rental fees and electricity charges for them." [59]

Within the timeframe demanded by Tempe, CCC responded by contacting Tempe to arrange for the removal of the Wi-Fi Equipment, but Tempe refused to permit CCC to remove said Equipment.[60]   Instead, Tempe decided to take a different tact, and instead held CCC's property for ransom.

Based on these representations of Tempe, and others, Tempe waived or is otherwise etopped from asserting an ownership interest in the WiFi Equipment.  Waiver is the voluntary intentional relinquishment of a known right, or conduct that would warrant an inference of such intentional relinquishment.[61] Estopped requires proof that

---

[57]   Affidavit of Henry Abbott, President of CCC, at paragraph 30.
[58]   Affidavit of Henry Abbott, President of CCC, at paragraph 31.
[59]   Affidavit of Henry Abbott, President of CCC, at paragraph 32.
[60]   Affidavit of Henry Abbott, President of CCC, at paragraph 33.
[61]   *Am. Cont'l Life Ins. Co. v. Ranier Constr. Co.,* 125 Ariz. 53, 55, 607 P.2d 372, 374 (1980); see *Jones v. Cochise County*, 218 Ariz. 372, 379-81, PP 22-29, 187 P.3d 97, 104-06 (App. 2908).

the defendant acted inconsistently with a claim or defense, and that the plaintiff relied on the defendant's actions and suffered prejudice because of that reliance.[62]

Under Arizona law, estoppel applies where a party shows: (1) affirmative acts inconsistent with a claim later relied on, (2) action by a party relying on such conduct, and (3) injury to the party from a repudiation of such conduct.[63]  As the court noted in *John C. Lincoln Hosp. & Health Corp., v. Maricopa County*[64]:

> * * * Questions of estoppel, including reasonable reliance, are fact-intensive inquiries. See *Nelson v. Phoenix Resort Corp.*, 181 Ariz. 188, 196, 888 P.2d 1375, 1383 (App. 1994); *Cook v. Great W. Bank & Trust*, 141 Ariz. 80, 86, 685 P.2d 145, 151 (App. 1984).  We defer to the trial court with respect to any factual findings explicitly or implicitly made, affirming them so long as they are not clearly erroneous, even if substantial conflicting evidence exists.  *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 254, P 10, 63 P.3d 282, 285 (2003); *Kocher v. Ariz. Dep't of Revenue*, 206 Ariz. 480, 482, P9, 80 P.3d 287, 289 (App. 2003).

In this case, as to the first element of estoppel, Tempe took an affirmative position in the Correspondence which is inconsistent with its current claim of ownership.  In particular, in the Correspondence, Tempe formally recognized that the Wi-Fi Equipment was owned by CCC, and demanded that CCC "either needs to remove its equipment immediately or pay rental fees and electricity charges for them."[65]  This conduct by Tempe is inconsistent with its current claim that it owns the WiFi Equipment.

---

[62] *John C. Lincoln Hosp. & Health Corp. v. Maricopa County*, 208 Ariz. 532, 537-38, PP 10-13, 96 P.3d 530, 535-36 (App. 2004).

[63] See *John C. Lincoln Hosp. & Health Corp., v. Maricopa County*, 208 Ariz. 532, 537, 96 P.3d 530, 535 (App. 2004); *Lowe v. Pima County*, 217 Ariz. 642, 177 P.3d 1214, 1222 (App. 2008).

[64] Supra, 208 Ariz. At 537, 96 P.3d at 535.

[65] Affidavit of Henry Abbott, President of CCC, at paragraph 32.

As for the second element of estoppel, CCC relied on Tempe's prior acknowledgement of CCC's ownership of the WiFi Equipment. Among other things, CCC held MobilePro assets in two private funds (Commonwealth Income & Growth Private Fund I, LLC and Commonwealth Income & Growth Private Fund II, LLC) and one publicly registered fund (Commonwealth Income & Growth Fund V, LP). [66] For all three funds, CCC used the performance and portfolios of these funds as a basis for new investors to evaluate CCC's track record of asset management when purchasing new fund shares. [67] CCC used the City's acknowledgement of CCC's ownership of the WiFi Equipment in its evaluation and reporting of all three of the above-mentioned funds. [68]

As to the third element of estoppel, CCC was injured by Tempe's repudiation of its previous acknowledgement of CCC's ownership of the WiFi Equipment. CCC made certain decisions, including representations to investors, and otherwise changed uits position as it relates to all three of the above-mentioned funds based on the City's acknowledgement of CCC's ownership of the WiFi Equipment. [69]

Based on these uncontroverted facts, Tempe is estopped from denying that CCC owns the WiFi Equipment, and should be held to its previous acknowledgement that CCC owned the WiFi Equipment. Accordingly, as a matter of law, CCC is entitled to summary judgment and immediate possession of that WiFi Equipment.

---

[66]  Affidavit of Henry Abbott, President of CCC, at paragraph 34.
[67]  Affidavit of Henry Abbott, President of CCC, at paragraph 35.
[68]  Affidavit of Henry Abbott, President of CCC, at paragraph 36.
[69]  Affidavit of Henry Abbott, President of CCC, at paragraph 37.

## IV. __CONCLUSION__

Based on the uncontroverted facts of this case, as a matter of law CCC owns the WiFi Equipment, and therefore it is entitled to partial summary judgment on Count Three of its Complaint, and an Order of Possession allowing CCC to replevin the WiFi Equipment. For the same reasons, CCC is entitled to partial summary judgment on Count III of Tempe's Counterclaim, in which Tempe seeks declaratory judgment as to the ownership of the WiFi Equipment.

Respectfully submitted,

/s/ George R. Hicks, Jr.
GEORGE R. HICKS, JR.
ROSEMARY TAFT MILBY
WELTMAN WEINBERG & REIS CO LPA
323 W Lakeside Avenue, Suite 200
Cleveland , OH 44113
Fax: 216-685-4345
Telephone:  216-685-1108
Email: ghicks@weltman.com
Telephone:  216-685-1103
Email: rtaftmilby@weltman.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2010, a copy of *PLAINTIFF/COUNTER-DEFENDANT COMMONWEALTH CAPITAL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT* was filed electronically. Notice of this filing will be sent to all parties that have appeared by operation of the Court's Electronic filing system. Parties may access this filing through the Court's system.

*/s/* George R. Hicks. Jr.
George R. Hicks, Jr.