UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| COMMONWEALTH CAPITAL CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | 2:09-cv-00274 JWS |
| vs. | ) ) | ORDER AND OPINION |
| CITY OF TEMPE, MOBILEPRO CORPORATION, NEOREACH INC., | ) ) ) ) | [Re: Motions at Docket 47 & 55 ] |
| Defendants. | ) ) ) | |

I.  MOTIONS PRESENTED

At docket 47, plaintiff Commonwealth Capital Corporation ("CCC") moves for partial summary judgment on Count 3 of its complaint.  Defendant City of Tempe ("Tempe") opposes the motion at docket 57 and CCC's reply is filed at docket 62.

At docket 55, Tempe moves for summary judgment in its favor on CCC's action for replevin, and for a declaratory judgment that it owns the property in dispute.[1]  CCC

---

[1]As discussed in Part III of this opinion, a motion for declaratory judgment is inconsistent with the Federal Rules of Civil Procedure. The court will construe Tempe's motion for declaratory judgment as a motion for summary judgment on its action for a declaratory judgment.

opposes the motion at docket 61 and Tempe's reply is filed at docket 63.  Oral

argument was not requested with respect to any of the motions presented and would

not assist the court.

## II.  BACKGROUND

This case involves disputed ownership of the hardware components of a city-

wide wireless network in Tempe, Arizona.  On August 18, 2005, Tempe contracted with

MobilePro Corp. ("MobilePro") and its wholly owned subsidiary, NeoReach, Inc.

("NeoReach"), for the installation and operation of a Wi-Fi network.[2]  Because the

network was to be set up on municipal utility poles and other city property, Tempe

granted NeoReach a conditional license.

The contract provided that the license was "for NeoReach only and [that] any

transfer of control of the WiFi network to any third party . . . not also licensed or

otherwise authorized by the City" was prohibited without amending the contract.[3]  The

contract also included an abandonment provision, in which the parties agreed that "[i]f

NeoReach abandon[ed] the WiFi network . . . for a period of three (3) months or more,

the Equipment . . . required to operate the Wi-Fi network within the City's right-of-way

[would] convert to City ownership."[4]  The contract defined "WiFi Network System" as "a

---

[2]MobilePro and NeoReach frequently will be collectively referred to as "NeoReach."

[3]Doc. 1-1 at 36.

[4]Doc. 1-1 at 42.

broadband grid to provide WiFi services" and "Equipment" to include "any tangible component of the WiFi network."[5]

On June 8, 2006, NeoReach had fulfilled its contractual obligations to the city by installing 560 Wi-Fi nodes. NeoReach installed additional nodes, to enhance the network's performance, and ultimately the network comprised 906 nodes. On June 26, 2006, NeoReach entered into a sale and leaseback arrangement with JTA Leasing Co., LLC ("JTA").[6] Under the arrangement, JTA paid $500,000 for certain Wi-Fi equipment that was part of Tempe's network and NeoReach agreed to lease the equipment from JTA. Tempe was unaware of that transaction and Tempe's agreement with NeoReach was not amended to reflect it. Less than two weeks after the sale and leaseback, JTA sold some of the Wi-Fi equipment that it had purchased from NeoReach to CCC.

On October 31, 2007, Tempe's contract with NeoReach was amended to replace NeoReach with Gobility, Inc. ("Gobility"). By December 27, 2007, Gobility had ceased operation of the network. Despite repeated warnings from Tempe–that Gobility's conduct constituted abandonment and that Gobility was in breach–Gobility never resumed operations. On February 4, 2008, only days after Tempe first notified Gobility that its conduct constituted abandonment, CCC sent Tempe a letter indicating that it owned "certain equipment constituting a significant part" of the network.[7] In a letter to CCC dated October 28, 2008, Tempe warned CCC that it either "need[ed] to remove its

---

[5]Doc. 1-1 at 2.

[6]Doc. 47-2 at 4.

[7]Doc. 55-4 at 31.

equipment immediately or pay rental fees and electricity charges."[8]  On December 4, 2008, Tempe sent CCC another letter demanding fees and indicating Tempe's revised "understand[ing] that the true number of nodes owned by Commonwealth [was] 667."[9] A final demand letter was sent on December 22, 2008.

CCC filed suit against Tempe, MobilePro and NeoReach on February 10, 2009. Counts 1 and 2 sought damages and accounting from MobilePro and NeoReach for breach of their lease agreement.  Those counts were resolved on April 28, 2010, when the parties stipulated to a partial judgment and partial dismissal whereby MobilePro agreed to pay $904,620 in back rent and was dismissed as a defendant.  Count 3 is an action against Tempe, for replevin of the network equipment that CCC claims to own. Tempe filed a counterclaim against CCC for unjust enrichment, an action for declaratory judgment that it owns the entire network, and a claim against Gobility as a third party defendant for breach of contract.  CCC asserts ownership of 667 nodes making up part of the city-wide Wi-Fi network in Tempe.  Tempe maintains that on March 28, 2008, three months after Gobility abandoned the network, the network equipment became city property in accordance with the abandonment provision in its contract with NeoReach and, as amended, Gobility.  In the alternative, Tempe seeks to compel payment of rent and fees for the use of city property.

## III.  STANDARD OF REVIEW

### A. Summary Judgment

_____

[8]Doc. 55-4 at 40.

[9]Doc. 55-4 at 43. CCC had originally claimed to own 785 nodes.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."[10]  The materiality requirement ensures that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[11]  Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[12]  In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.[13]  The reviewing court may not weigh evidence or assess the credibility of witnesses.[14]  The burden of persuasion is on the moving party.[15]

**B. Declaratory Judgment**

Under 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[16]  Federal Rule of Civil Procedure 57 states that the Federal Rules of Civil Procedure "govern the procedure for obtaining a

---

[10]FRCP 56(c)(2).

[11]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[12]*Id.*

[13]*Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000).

[14]*Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[15]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[16]28 U.S.C. § 2201.

declaratory judgment under 28 U.S.C. § 2201."[17]  Because the Federal Rules of Civil

Procedure do not provide for a motion for declaratory judgment, "a party may not make

a *motion* for declaratory [judgment], but rather, the party must [make] . . . a motion for

summary judgment on [its] action for a declaratory judgment."[18]  The court will therefore

construe Tempe's motion for declaratory judgment as a motion for summary judgment

on its action for declaratory judgment, and apply the standard of review described

above.

### IV.  DISCUSSION

**A. Tempe's Rule 37 Objection to Late Disclosed Documents Has Merit**

The first question is whether CCC can support its motion with certain documents,

including invoices and a bill of sale, that are helpful in identifying the equipment that

CCC claims to own.  Federal Rule of Civil Procedure 37 provides that "[i]f a party fails to

provide information . . . as required by Rule 26(a) . . . the party is not allowed to use that

information . . . to supply evidence on a motion."[19]  The relevant portion of Rule 26(a)

requires provision of "a copy – or a description by category and location – of all

documents . . . that the disclosing party has in its possession, custody, or control and

may use to support its claims."[20]  To satisfy its duty to disclose, CCC provided a

categorical list of documents that were in its control. Of the categories on the list, only

---

[17]Fed. R. Civ. P. 57.

[18]*Kam-Ko Bio-Pharm Trading Co. v. Mayne Pharma*, 560 F.3d 935, 943 (9th Cir. 2009).

[19]Fed. R. Civ. P. 37(c)(1).

[20]Fed. R. Civ. P. 26(a)(1)(ii).

two could have referenced documents not attached to CCC's complaint: one labeled "Four Lease Agreements (schedules of equipment)" and one labeled "Emails from Plaintiff's employees spanning the years 2007 to 2009."[21]

CCC included in its motion for summary judgment numerous invoices that identified (by description only) wireless network equipment sold to MobilePro and NeoReach by wholesaler Connectronics.  CCC also supports its motion with a bill of sale and UCC Filing Statements that Tempe argues were not disclosed, and schedules of equipment that Tempe argues were disclosed, but not produced in response to its informal requests.

### 1. Rule 37 Bars Consideration of the Invoices and UCC Filing Statements

CCC argues that its initial disclosures "clearly satisfy" the requirement of Federal Rule 26(a), that a party provide "a description by category and location" of the documents to be used to support its claim.[22]  CCC does not, however, explain how this compliance is achieved with respect to the invoices or UCC Filing Statements that it uses to support its motion.  The only category into which those documents might fit is the category labeled "Four Lease Agreements (schedules of equipment)."  CCC has not demonstrated how "Four Lease Agreements (schedules of equipment)" is capable of describing either invoices or UCC Filing Statements.  Because the invoices and UCC Filing Statements were not adequately disclosed in compliance with Rule 26(a)(1),

---

[21]Doc. 64-1 at 8–9.

[22]Doc. 62 at 4.

under Rule 37(c)(1), CCC cannot use them to support its motion for partial summary judgment.

### 2. The Schedules of Equipment and Bill of Sale Were Adequately Described in CCC's Initial Disclosures

It is true, as CCC contends, that "a duty to disclose is not synonymous with a duty to produce."[23]  It is instead expected that parties seeking discovery proceed formally, "under Rule 34, or through informal requests."[24]  Tempe made repeated informal requests, via e-mail, for any documents that CCC might use to establish its claim of ownership.[25]  Nonetheless, CCC emphasizes that Tempe did not make any formal requests for document production under Rule 34, and therefore CCC was under no legal duty to produce the documents informally requested.  Although the District of Arizona has recognized that the advisory committee to Rule 26 expected that informal document requests would often suffice to procure documents contained in a party's initial disclosures, there is nothing that elevates the advisory committee's expectation to law.[26]

CCC did include in its initial disclosures a category labeled "Four Lease Agreements (schedules of equipment)."  Despite the shortcomings of this description–"lease agreements" is not only broad but arguably imprecise–it is enhanced

---

[23]*Forbes v. 21st Century Ins. Co.*, 258 F.R.D. 335, 337 (D. Ariz. 2009).

[24]*Id.* at 338.

[25]*See* doc. 64-1 at 13–20.

[26]*See Forbes*, 258 F.R.D. at 338.

somewhat by the parenthetical.  To the extent Tempe was interested in learning exactly what equipment CCC claimed to own, it could have sought discovery of the potentially useful "schedules of equipment."  In addition, the Master Lease Agreement, between NeoReach and JTA, was attached to CCC's complaint.  Section 18(b) of that agreement indicates that "the entire Agreement" included "attached Equipment Schedules, [a] Bill of Sale and Supplements."[27]  Notwithstanding the imprecision of CCC's description, it appears that the bill of sale was actually part of a "Lease Agreement," which was described by its category in CCC's initial disclosures.  Reference to the bill of sale in a document already in Tempe's possession also severely undercuts any claim of prejudice.

The court recognizes that Tempe's repeated efforts to obtain the relevant documents were ignored, but Tempe should have formally requested the schedules of equipment and bill of sale pursuant to Rule 34.  Because Tempe did not, there is no basis for excluding Equipment Schedules No. 1, 2, 3 and 6 or the Bill of Sale from NeoReach to JTA Leasing, from consideration in deciding CCC's motion.

In accordance with Federal Rule of Civil Procedure 37, the court will consider Equipment Schedules No. 1, 2, 3 and 6 and the Bill of Sale from MobilePro to JTA in resolving the motions before it and will disregard the invoices and UCC Filing Statements.

**B. CCC's Motion for Partial Summary Judgment**

---

[27]Doc. 1-1 at 7.

**1. The Absence of an After-Acquired Property Clause is Inconsequential and the Cited Provisions of the UCC Irrelevant**

CCC gives much weight to the absence of an after-acquired property clause in Tempe's contract with NeoReach and emphasizes parallels drawn to provisions of the Uniform Commercial Code ("UCC").  CCC's arguments are based on the frivolous notion that the abandonment clause in Tempe's contract with NeoReach only applies to Wi-Fi equipment that was in place on the date of the agreement–August 18, 2005. There was no equipment in place on August 18, 2005 because the purpose of the contract was to create the wireless network.  It was clearly not the parties' intention to subject to the abandonment provision only that equipment in place on the date the contract became effective.  Because after-acquired property is not in issue, UCC provisions dealing with security interests in after-acquired property are not relevant.

**2. CCC Has Established that NeoReach Sold At Least Some Constituent Parts of the Wireless Network**

   **a. There is No Genuine Issue of Material Fact as to NeoReach's Sale of Some Equipment to JTA or CCC's Purchase of Wi-Fi Equipment From JTA**

Whether NeoReach sold some of the equipment making up Tempe's Wi-Fi network is material.  Any equipment that NeoReach did not sell remained subject to the abandonment clause in Tempe's contract with NeoReach and, as amended, Gobility.

The Bill of Sale between NeoReach and JTA was part of their Master Lease Agreement.[28]  It provides that NeoReach sold to JTA $500,000 worth of equipment identified as "Sch #1."[29]  Because the bill of sale was part of the lease agreement, it is clear that this reference is to Equipment Schedule No. 1.  CCC has established that JTA purchased and leased-back to NeoReach the equipment in Schedule No.1.

Exhibit A to the Agreement of Sale and Assignment between JTA and CCC describes the equipment purchased by CCC as being located "[w]ithin the city of Tempe, AZ."[30]  It also indicates that the equipment was purchased for $510,000 and remained subject to "Equipment Schedule No. 001 to [the] Master Equipment Lease Agreement dated May 23, 2006" between JTA and MobilePro."[31]  CCC has not provided a Master Equipment Lease Agreement that is dated May 23, 2006.  CCC has demonstrated, though, that it purchased $510,000 worth of computer equipment, originally owned and subsequently leased by NeoReach (or MobilePro), that was within the City of Tempe.  Tempe has not contradicted CCC's evidence of either sale.  Even viewing that evidence in the light most favorable to Tempe, CCC has established that NeoReach sold at least some of the equipment constituting Tempe's Wi-Fi network and that CCC purchased computer equipment from JTA in a related transaction.

---

[28]*See* doc. 47-5 at 7.

[29]Doc. 47-4 at 1.

[30]Doc. 47-6 at 8.

[31]*Id.*

Therefore, questions surrounding the timing, contingency and vesting of each party's purported interests must be answered in light of the following: 1) neither NeoReach nor GoBility abandoned the wireless network equipment prior to the sale of some of that equipment–NeoReach may have breached its contract with Tempe by selling the equipment, but sale does not constitute abandonment; and 2) CCC has produced a bill of sale from NeoReach to JTA.  That sale predates the first possible time that ownership of all of the equipment could have converted to Tempe.[32]

Tempe argues that its ownership interest predates CCC's because Tempe's contract with NeoReach was entered into approximately eleven months prior to CCC's purchase.  This argument is flawed.  The contract provides that ownership of the equipment "shall convert" to the city upon abandonment.  Taken in context, the abandonment provision would only function to convert ownership upon the happening of the stated event.  The earliest that Tempe's ownership interest could have arisen was three months after GoBility's abandonment of the network, or March 28, 2008.  By this time, some of the network equipment had already been sold.

Whether CCC had notice of the abandonment provision in Tempe's contract with NeoReach is not dispositive.  For one, the existence of the abandonment clause could not have been "a fact affecting property which [CCC sought] to purchase"[33] until abandonment occurred.  Similarly, once sold, the new owner could not be bound by

---

[32]The Bill of Sale between NeoReach and JTA is dated June 28, 2006. JTA signed the Agreement of Sale and Assignment between it and CCC on the same day, although CCC did not sign until July 5, 2006.

[33]*U.S. Fiduciary Corp. v. Loma Vista Associates,* 675 P.2d 724, 728 (Ariz. Ct. App. 1978).

Tempe's agreements with NeoReach and Gobility.  CCC appears to have been on inquiry notice of the facts that 1) the equipment was placed such that it was subject to a license from the city; and 2) that NeoReach was likely in breach of its agreement with the city, having transferred control of the network without Tempe's authorization. However, as discussed in section IV.C, Tempe has not established that notice of a license requirement or NeoReach's potential breach is enough to invalidate the sale.

### b. There is a Genuine Issue of Material Fact Regarding Identification of the Equipment Owned By CCC

CCC maintains that it owns the equipment listed in Equipment Schedules No. 1, 2, 3 and 6.[34]  The Bill of Sale from NeoReach to JTA refers solely to Equipment Schedule No. 1.[35]  Equipment Schedule No. 1 lists a total of 584 individual Wi-Fi components, which Tempe has indicated is sufficient to create 174 nodes.[36]  In the Agreement of Sale and Assignment between JTA and CCC, CCC agreed to purchase all equipment "listed on Exhibit A."[37]  Exhibit A states that the subject of the sale was "Computer equipment as follows: See Schedule A."[38]  CCC has not provided Schedule A. If "Schedule A" is actually "Attachment 'A'" to the Master Lease Agreement between JTA and NeoReach, then CCC agreed to purchase the equipment listed in Schedule

---

[34] *See* doc. 47-12 at 2 n.1.

[35] The bill of sale states that "NeoReach . . . sells and transfers to [JTA] the following equipment (Sch #1)." Doc. 47-4 at 1.

[36] Doc. 55-1 at 9.

[37] Doc. 47-6 at 1.

[38] *Id.* at 8.

No. 1.  However, if the evidence is viewed in the light most favorable to Tempe, CCC has not identified any equipment that it owns because it did not provide Tempe or the court with Schedule A to the Agreement of Sale and Assignment between JTA and CCC.  Therefore, there is a genuine dispute regarding what equipment CCC actually owns.

It should be noted that the Agreement of Sale and Assignment does state that the "Buyer [CCC] desires to purchase from Seller [JTA], the Equipment subject to the Lease."[39]  The Agreement of Sale clarifies that "Lease" refers to a "Master Equipment Lease Agreement dated May 23, 2006" (between JTA and NeoReach) and "Equipment Schedule No. 001."[40]  However, there is no Master Equipment Lease Agreement dated May 23, 2006 in the record.  It is possible that this is a mistaken reference to the Master Lease Agreement and Equipment Schedule No.1.  However, the potential for a favorable construction does not entitle CCC to summary judgment.  The evidence must be viewed in the light most favorable to Tempe, and in that light, the Agreement of Sale and Assignment does not adequately establish what equipment CCC purchased.

There are other identification problems.  CCC has provided no link between Equipment Schedules No. 2, 3, and 6 and the Bill of Sale from NeoReach to JTA or the Agreement of Sale and Assignment between JTA and CCC.  Equipment Schedules No. 2, 3 and 6 all appear to be separate leases governed by the terms set out in the Master Lease Agreement between JTA and NeoReach.  Even though, as presented to the

---

[39]Doc. 47-6 at 1.

[40]*Id.*

court, the additional Schedules were separated from the Master Lease Agreement by e-mails, a host of inadmissible UCC filing statements, and various correspondence from CCC, it is quite possible that the additional Schedules fall within § 1 of the Master Lease Agreement, and are accordingly governed by its terms as part of that agreement.[41]   However, CCC has not demonstrated any nexus between those Schedules and either *sale* agreement.  Without such a nexus, CCC cannot meet the requisite standard for summary judgment in its favor as to ownership of the items in those schedules.

### 3. Tempe is Not Estopped From Claiming Ownership of the Network

CCC argues that Tempe is "estopped from denying that CCC owns the WiFi Equipment."[42]  The elements of equitable estoppel are: "(1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct."[43]

### a. Tempe's Position is Inconsistent with Earlier Acts

In its earliest correspondence with CCC, Tempe did not dispute CCC's ownership claim.  Tempe's first letter to CCC stated outright that "Commonwealth either need[ed] to remove its equipment immediately or pay rental fees and electricity charges."[44]  The letter also references a June 24, 2008 meeting with CCC, in which

---

[41]*See* doc. 47-5 at 1.

[42]Doc. 47-12 at 21.

[43]*Valencia Energy Co. v. Arizona Dep't of Revenue*, 959 P.2d 1256, 1267–68 (Ariz. 1998).

[44]Doc. 55-4 at 40.

Tempe informed CCC that it would be forced to take legal action if CCC did not immediately provide "either Wi-Fi service or rent."[45]   Tempe's letter of December 4, 2008 is consistent in its acknowledgment of CCC's ownership of some of the network equipment.  Tempe stated that it was aware of "Commonwealth's desire to remove the nodes it own[ed]."[46]   Tempe also indicated its "understand[ing] that the true number of nodes owned by Commonwealth is 667."[47]   Finally, in its letter of December 22, 2008, Tempe stated that "Commonwealth's ownership of the nodes currently trespassing on the City's right-of-way . . . means that Commonwealth owes the City of Tempe money."[48]

Tempe's statements are not inconsistent with its position that it owns some of the Wi-Fi network, but they are inconsistent with the proposition that Tempe owns the network in its entirety.  Tempe maintains that it has adhered to "two overlapping theories: (1) If [CCC] validly owns any of the Wi-Fi equipment in Tempe's network, [CCC] owes Tempe occupancy fees . . . (2) all Wi-Fi equipment not validly owned by [CCC] belongs to Tempe, pursuant to the . . . abandonment provision."[49]   This summary of Tempe's "overlapping" theories is inconsistent with its motion for summary judgment,

---

[45]*Id.*

[46]*Id.* at 43.

[47]*Id.*

[48]*Id.* at 45.

[49]Doc. 57 at 11.

in which Tempe seeks a determination "that Tempe owns all of the Wi-Fi network equipment within the City's right-of-way."[50]

### b. CCC Has Not Demonstrated that it Detrimentally Relied on Tempe's Shift

The second and third elements of estoppel require a showing of detrimental reliance. CCC claims that it relied on Tempe's acknowledgment of CCC's ownership of the network equipment in making representations to investors. Specifically, CCC claims that it used "the performance and portfolios of . . . funds [holding MobilePro assets] as a basis for new investors to evaluate CCC's track record of asset management when purchasing new fund shares."[51] CCC's argument at most implicates attenuated third party reliance, not its own. Although CCC may have included the wireless network equipment in its calculus of fund assets, CCC has not demonstrated that it would not have done so but for Tempe's representations. CCC provides no dates or other secondary measure from which to draw an inference of specific reliance on Tempe's original position. The reliance of potential investors on numbers provided by CCC is insufficient because reliance by a party is required. Moreover, even if CCC were able to demonstrate that it relied on the representations in Tempe's letters, it has not demonstrated that it was injured. CCC offers only a conclusory statement that it "was injured by Tempe's repudiation of its previous acknowledgement of CCC's

---

[50]Doc. 55 at 2.

[51]Doc. 47-12 at 21.

-17-

ownership of the WiFi Equipment."[52]  Nothing in the affidavit of Henry Abbott

strengthens CCC's bare allegations.

CCC has failed to present facts satisfying the second and third elements of

equitable estoppel.  Tempe is not estopped from either claiming ownership of the entire

Wi-Fi network or denying that CCC owns some of it.

## C. Tempe's Motions For Summary Judgment

### 1. Consideration of CCC's Entitlement to Replevin is Premature

Tempe maintains that "[t]he [c]ourt should grant summary judgment against"

CCC in its action for replevin.  In a federal district court, replevin is available to the

extent it is available "under the law of the state where the court is located."[53]  CCC, in its

effort to obtain replevin, must follow Arizona procedure.  Arizona requires initially an

affidavit to obtain possession, but it may be filed "at any time after complying with the

provisions of chapter 14 . . . and before rendition of judgment."[54]  Chapter 14 requires

that CCC apply for any provisional remedy, but the application may be made "at any

time after the filing of [the] action."[55]  Tempe argues that because CCC has not followed

requisite Arizona procedure, summary judgment should be entered in Tempe's favor.

CCC has yet to follow the necessary procedure, but as the statutes make clear, it is

under no present obligation to do so. As set out in preceding parts of this opinion, there

---

[52]*Id.*

[53]Fed. R. Civ. P. 64(a).

[54]A.R.S. § 12-1301.

[55]A.R.S. § 12-2404.

remains a genuine dispute as to material issues of fact regarding the ownership of the Wi-Fi equipment. Until the question of ownership is resolved, it is too early to foreclose potential remedies.

**2. Tempe is Not Entitled to Summary Judgment in its Action for a Declaratory Judgment that it Owns the Wi-Fi Equipment in its Entirety**

**a. Tempe's Entitlement to the Benefit of its Bargain Does Not Affect the Question of Ownership**

Tempe argues that the abandonment provision in its contract with NeoReach should be given effect.  The abandonment provision states that "[if] NeoReach abandons the WiFi network . . . for . . . three (3) months or more, the Equipment and associated software required to operate the Wi-Fi network within the City's right-of-way shall convert to City ownership."[56]  There are two problems with Tempe's argument. First, the stated condition on conversion–abandonment–was never fulfilled, at least with respect to any equipment sold by NeoReach.  Once NeoReach sold some of the network equipment, it could no longer abandon that equipment.  Any subsequent abandonment of that equipment would be attributable to JTA or CCC, neither of which was a party to the contract.  To enforce a contract against a third party that was not made a party to it or beneficiary is contrary to basic principles of contract law.[57] Tempe's appropriate course of action is to seek damages from the breaching party.

---

[56]Doc. 1-1 at 42.

[57]*See, e.g.*, *Treadway v. Western Cotton Oil & Ginning Co.*, 10 P.2d 371, 375 (Ariz. 1932) ("[A]s a general rule only the parties and privies to a contract may enforce it.").

-19-

### 3. NeoReach's Sale of the WiFi Equipment to JTA is not Unenforceable as a Matter of Public Policy

Tempe argues generally that the sale and lease-back agreement between NeoReach and JTA is unenforceable.  Tempe cites *Hanigan v. Wheeler*[58] for the overarching propositions that limitations on assignment rights are valid and that attempted assignments in violation of such limitations are not effective.[59]  Although the former proposition is supported therein, the case explicitly contradicts the latter.  The court stated outright that "[w]here a contract contains a [p]romise to refrain from assigning, an assignment which violates it would *not* be ineffective."[60]  This position is consistent with the Restatement, which provides that "[a] contract term prohibiting assignment of rights under the contract . . . gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective."[61]

Even if Tempe's reading of the case were correct, assignment of the rights created by its agreement with NeoReach is not an issue.  NeoReach probably breached its contract with Tempe when it sold some of the WiFi Equipment to JTA Leasing without obtaining Tempe's consent.[62]  However, NeoReach did not explicitly assign the license it had obtained from the city and there is no basis for finding an "implicit"

---

[58]504 P.2d 972 (Ariz. Ct. App. 1972).

[59]Doc. 55 at 14.

[60]*Hanigan*, 504 P.2d at 975 (emphasis added).

[61]Restatement (Second) of Contracts § 322(2)(b).

[62]Doc. 1-1 at 36.

assignment because NeoReach, and later Gobility, continued to operate the network (until Gobility abandoned it).[63]  Any contemporaneous assignment would have constituted breach by NeoReach, but that is not a basis to declare the sale ineffective.

Tempe argues that the sale agreement between NeoReach and JTA is "void as against public policy."[64]  In support of its position, Tempe cites *Mountain States Bolt v. Best-Way Transp.*, which restated "[t]he applicable principles for determining when a contract is unenforceable as against public policy."[65]  "Generally, an agreement which cannot be performed without violating applicable law, is illegal and void."[66]  Tempe cites Tempe City Codes §§ 31A-12(b)(5)(a) & 31A-42.  The former states that "licenses shall be personal to the . . . licensee" and that "no transfer of a . . . licensee, or change of control over the same . . . shall occur" without the city's consent.[67]  Any sale of network equipment would not have violated this provision because, as discussed above, no license or licensee was transferred.  The only change of control involved control of some of the network equipment, not the license or licensee.  NeoReach was licensed and continued to operate the network until the agreement was amended, and the license was transferred to Gobility.  Tempe City Code § 31A-42 makes it "unlawful for any provider to occupy the streets and public rights-of-way unless the provider is in

---

[63]*See* doc. 55 at 14.

[64]*Id.* at 15.

[65]568 P.2d 430, 431 (Ariz. Ct. App. 1977).

[66]*Id.* (internal quotations omitted).

[67]Tempe, Ariz., City Code § 31A-12(b)(5)(a).

compliance" with the other provisions of the chapter.[68]  This provision only declares that violations of other provisions are unlawful and does not provide an independent basis on which to find NeoReach's sale of network equipment void as against public policy.

**4. Tempe is Not Entitled to Summary Judgment that CCC Owes It Occupancy Fees Because Material Issues of Fact Remain As to Ownership**

Tempe argues that "if the Court finds that [CCC] validly purchased nodes within Tempe's Wi-Fi network," the court should declare that CCC owes Tempe occupancy fees.[69]  Because there are still genuine issues of material fact regarding ownership of the Wi-Fi network, it is premature to make such a declaration on the basis of Tempe City Code provisions that apply to telecommunications providers.

**a. There is No Genuine Dispute of Material Fact Regarding Whether the Owner of the Wi-Fi Equipment that NeoReach Sold Was Enriched**

Tempe also argues that "[t]he principle of unjust enrichment also entitles Tempe to a" judgment that CCC "must make restitution to Tempe of unpaid occupancy fees."[70] The elements of an unjust enrichment claim are "(1) an enrichment, (2) an impoverishment, (3) a connection between the two, (4) the absence of justification for the enrichment and impoverishment and (5) the absence of any remedy at law."[71]

---

[68]*Id.* § 31A-42.

[69]Doc. 55 at 17.

[70]*Id.* at 18.

[71]*Mousa v. Saba*, 218 P.3d 1038, 1045 (Ariz. Ct. App. 2009).

Although the question of enrichment cannot be fully resolved with respect to CCC until ownership is clarified, it is clear that the owner of the equipment originally sold by NeoReach has been enriched at Tempe's expense.  The owner of that equipment has stored it on city property–without paying any form of rent–since Gobility abandoned the network in 2007.  In addition, Tempe has been impoverished insofar as it has been deprived of the unfettered use of its property.  The owner's enrichment and Tempe's impoverishment are clearly related.

There is a dispute as to the material fact of whether CCC was improperly denied an opportunity to remove the equipment it claims to own.  This material fact bears on whether there was an absence of justification for the enrichment and impoverishment.  CCC claims to have "contact[ed] Tempe to arrange for the removal of the Wi-Fi [e]quipment, but [that] Tempe refused to permit CCC to remove" it.[72]  Tempe maintains that CCC was unable to identify the particular items within the network that it claimed to own.  Beneath the overarching issue of ownership, there are genuine disputes of material fact pertinent to the remaining elements of unjust enrichment.

## V.  CONCLUSION

For the reasons set forth above, Plaintiff CCC's motion at docket 47, for partial summary judgment on Count 3 of its complaint is **GRANTED in part and DENIED in part**.  It is granted to the extent that there is no genuine dispute that the equipment sold by NeoReach to JTA did not remain subject to the abandonment provision in Tempe's

---

[72]Doc. 47-1 at 9.

contract with NeoReach.  It is denied insofar as CCC has not established ownership of

particular equipment in the city's Wi-Fi network.  Defendant Tempe's motion at docket

55, for summary judgment in its favor on Count 3 of CCC's complaint and for summary

judgment on its own action for declaratory judgment is **DENIED**.

DATED this 4th day of October 2010.


_____
/S/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE